United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 9, 2004**

Charles R. Fulbruge III
Clerk

**REVISED JANUARY 30, 2004**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 02-51339
_____

DOUGLAS ALAN ROBERTS,

Petitioner - Appellant,

versus

DOUG DRETKE, DIRECTOR TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent - Appellee.

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, WIENER, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Petitioner Douglas Alan Roberts ("Roberts") seeks a certificate of appealability ("COA") on

his claims that his attorney rendered ineffective assistance in his Texas death penalty trial, wherein

he was convicted of capital murder and sentenced to death.[1] Roberts contends that his trial attorney,

Steven Pickell ("Pickell"), rendered ineffective assistance of counsel because of his deficient

_____

[1] The district court granted Roberts a COA on one other claim presented in his federal habeas petition. Roberts's instant petition is limited to his request for COA on his ineffective assistance claim, which was denied a COA in the district court.

preparation, including (1) his failure to adequately prepare for trial, specifically his failure to hire an investigator and interview witnesses for trial including Roberts's family members about testifying as mitigating witnesses in the punishment phase of Roberts's trial; (2) failure to properly develop evidence of Roberts's mental illness; and (3) his failure to make adequate use of Roberts's court-appointed psychiatrist. Roberts maintains that the state court decision holding that Pickell satisfied the minimum standard of performance required of an attorney representing a capital client who is known to have mental health problems is an unreasonable application of clearly established federal law, and that the district court's conclusion to the contrary is at least debatable among jurists of reason.

I

Before trial, Roberts advised Pickell of his desire to be convicted and sentenced to death. Pickell filed several pre-trial motions on Roberts's behalf, including a motion for expenses for a mental health expert, which the court granted to the extent of $1,000. A court-appointed psychiatrist, Dr. Michael Arambula ("Dr. Arambula"), conducted a "mental status examination" of Roberts. Pickell did not ask Dr. Arambula to investigate Roberts's family history, compile a social or psychiatric history of Roberts, or evaluate the potential mitigating evidence. The purpose of Dr. Arambula's mental status examination of Roberts was, simply, to ascertain whether Roberts was competent to direct his trial strategy towards death.

In preparing his report, Dr. Arambula relied exclusively on his own clinical interview with Roberts, the police reports, and the victim's autopsy report. Dr. Arambula was not, however, furnished with any other medical records, such as the record of Roberts's treatment for "psychiatric problems" and "suicide ideation," which occurred less then one year before the crime at issue in this

case. Nor was Dr. Arambula made aware of a head injury Roberts had suffered as a child. In his report, which was furnished to Pickell, Dr. Arambula concluded that Roberts did not suffer from any significant degree of depression, and that "[t]he most salient issue in Douglas Roberts's history is his addiction to crack cocaine."[2] Dr. Arambula concluded that, in seeking the death penalty for himself, Roberts was simply exercising his "right" to choose death over life.[3]

At various stages of the trial proceedings, Roberts and Pickell held "defense conferences" outside of the presence of the trial court and the prosecutor. These conferences, which Pickell transcribed, provide a record of Roberts's direction of a trial strategy towards death: Roberts instructed Pickell to excuse venire members who expressed any reservations about assessing the death penalty; not to "fight the death penalty" or ask for a life sentence in the closing argument; not to request a jury instruction on the parole laws, not to contact Roberts's family members about the trial or subpoena them as mitigation witnesses for the punishment phase; not to call Dr. Arambula) ) or any other mental health expert) ) as a mitigation witness at the punishment phase, not to request that

---

[2] Dr. Arambula elaborated:

Douglas Roberts's history reveals a reported episode of depression (he calls it a nervous breakdown) after which he started using crack cocaine. Over the ensuing years however, it is difficult to find another psychiatric disturbance[] (other than cocaine addiction) in his history. Further, Mr. Roberts denies experiencing any recent symptoms of depression during his sobriety in the Kerrville jail, and [the] mental status examination of him only reveals mild lability (instability) of his mood and affect. As a result, I cannot conclude that Mr. Roberts suffers from any significant degree of depression, or for all that matters, any other psychiatric disturbance.

[3] Dr. Arambula explained:

Depression can sometimes affect a person's judgment and decision-making so severely that they wish for a premature death. This situation is not so unusual in cases where patients refuse treatment or make suicide attempts under the duress of depression. Prior to my examination of Mr. Roberts, this issue was foremost in my approach to examining him. However, and as I state earlier, I cannot find that depression exists to such a degree that its presence would coerce Mr. Roberts into seeking the death penalty. Albeit surprising to most people, choosing death over life in the absence of severe mental disease is the right of any individual. Douglas Roberts's psychiatric evaluation fits this bill.

the jury be instructed that its failure to reach a decision on punishment will result in a life sentence; and not to present any evidence that would "help the jury answer [the punishment] questions in such a way that a life sentence would result." Consistent with Roberts's instructions, Pickell accepted venire members who were favorable to the death penalty; struck venire members opposed to the death penalty; conducted no individual voir dire to rehabilitate venire members who had initially indicated they were opposed to the death penalty;[4] did not interview Roberts's family members before trial; called no witnesses at the guilt/innocence phase of the trial; called no witnesses at the punishment phase; did not request a jury instruction on the parole laws; and made no argument in favor of a life sentence.

On direct appeal, Roberts argued that Pickell rendered ineffective assistance by complying with Roberts's self-destructive orders and directions. Roberts maintained that Pickell should have ignored his directions where those directions worked to Roberts's detriment. The court rejected this argument. It reasoned that, in every instance where Pickell followed Roberts's self-destructive instructions, Pickell had advised a contrary course of action, but Roberts had "disregarded that advice and directed his counsel to comply with the requests and orders." The court concluded that Roberts "cannot now claim his trial counsel was ineffective for complying with [Roberts's] own orders and requests on the conduct of his defense."

On state habeas review, Roberts claimed that Pickell rendered ineffective assistance of counsel. Roberts argued t hat Pickell's failure to request a competency hearing; to furnish Dr. Arambula with copies of his psychiatric records; school records and other background information; and to furnish the trial court with a copy of Dr. Arambula's report constituted ineffective assistance.

---

[4] Roberts waived individual voir dire of the jury panel in a pre-trial motions hearing.

The court found that Pickell failed to make Roberts's previous medical records available to Dr. Arambula and failed to advise Dr. Arambula of a head injury Roberts suffered as a child. However, the court also found that Pickell "did not observe, during the course of his pretrial meetings with the defendant or at any other phase of his investigation," evidence to support "incompetency or insanity." It reasoned that Pickell's "lay" observations in dealing with Roberts, taken together with his prior experience, led him to believe that there was no reasonable expectation that it would be of any value to raise issues of incompetency or insanity. The court thus concluded:

> The actions and demeanor of the defendant through these proceedings did not raise an issue as to require or necessitate a competency hearing. The failure of trial counsel, Mr. Pickell, to request a competency hearing, was not error nor did it amount to ineffectiveness of counsel.

On federal habeas review, Roberts re-urged his state-court claim of ineffective assistance of counsel. Roberts argued that Pickell rendered ineffective assistance by (1) failing to request a competency hearing for Roberts; (2) refusing Roberts's request for an EEG; (3) failing to adequately investigate Roberts's background; (4) failing to request a full neurophysical evaluation of Roberts; (5) failing to adequately prepare Dr. Arambula by furnishing him with copies of Roberts's relevant medical records; (6) deferring to Roberts's desires to waive individual voir dire, not to request a jury instruction regarding the impact of parole eligibility on a life sentence, not to call Roberts's family members to testify in mitigation at the punishment phase of trial, and not to argue in favor of a life sentence; (7) failing to request a speedy trial and, instead; (8) advising Roberts to waive individual voir dire as a means of securing a speedier trial setting; (9) failing to advise Roberts that jurors who favor the death penalty were predisposed to convict; and (10) failing to adequately cross-examine and rebut bloodstain pattern analysis testimony given by a prosecution witness.

-5-

In support of his petition, Roberts offered materials that had never been presented to the state courts, including: affidavits from his father and brother, records relating to his nine-day treatment at a psychiatric hospital for "suicide ideation," documents relating to a lawsuit stemming from an accident in which he was injured as a child, his own affidavit, his mother's mental health records, his own medical records from prison, and his handwritten notes to Pickell.

The federal habeas court found that Roberts failed to exhaust all available state remedies with regard to several aspects of his ineffective assistance claim, including his allegations that Pickell was ineffective for refusing Roberts's request for an EEG; for failing to request a neurophysical evaluation of Roberts; for failing to advise Roberts that jurors who favor the death penalty were predisposed to convict; and for failing to adequately cross-examine and rebut bloodstain pattern analysis testimony given by a prosecution witness. Thus the district court found that Roberts had procedurally defaulted on these aspects of his ineffective assistance claim.

On the merits, the federal habeas court concluded that Pickell's decision not to request a competency hearing did not constitute ineffective assistance of counsel. The district court found that Pickell did not perform deficiently because he "could have reasonably relied on Dr. Arambula's conclusions, which confirmed said counsel's own independent observations regarding [Roberts's] obvious ability to consult with counsel and understand the proceedings against him." Additionally, the court concluded that Pickell's performance did not prejudice Roberts's defense, "given the total absence of any evidence presented to the Texas Court of Criminal Appeals in the course of [Roberts's] direct appeal and state habeas corpus proceeding showing that [Roberts] could have satisfied the constitutional standard for showing incompetence to stand trial . . . ." On the remaining aspects of Roberts's claim of ineffective assistance, the court concluded that Roberts failed to show

deficient performance. It found that the Texas Court of Criminal Appeals reasonably held that Roberts's "clear specific directives to his trial counsel precluded a finding that said counsel acted in an objectively unreasonable manner when said counsel chose to follow [Roberts's] directives regarding trial strategy." It further found that Roberts made no showing of prejudice, as he did not present the state courts with any "allegations that, but for the act or omission of his trial counsel, [he] would have relented from his clearly self-destructive course of conduct."

Before Roberts can appeal the district court's adverse judgment, he must first obtain a COA. 28 U.S.C. § 2253(c)(1); *see Miller-El v. Cockrell*, 537 U.S. 332, 336, 123 S.Ct. 1029 (2003) (explaining that a COA is a "jurisdictional prerequisite" without which "federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). To obtain a COA, Roberts must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Roberts can make such a showing if he demonstrates that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El,* 537 U.S. at 342. To obtain a COA on any aspect of his ineffective assistance claim which the district court found to be procedurally barred, Roberts must show not only that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, but also that jurists of reason would find it debatable whether the district court was correct in its procedural rulings as to those claims. *Slack*, 529 U.S. at 484.

## II

Roberts argues that the state court's decision holding that Pickell's assistance was not

ineffective was an unreasonable application of clearly established federal law, and that the district court's conclusion to the contrary is at least debatable among jurists of reason. To demonstrate ineffective assistance of counsel, Roberts must show (1) that Pickell's performance was deficient, falling below an "objective standard of reasonableness," and (2) that Pickell's deficient performance prejudiced his defense (i.e., "'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"). *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495 (2000); *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984).

A

In his request for a COA, Roberts argues that Pickell's performance was deficient because of his inadequate trial preparation, including his failure to hire an investigator and interview witnesses for trial including Roberts's family members about testifying as mitigating witnesses in the punishment phase of his trial; because of his failure to properly develop evidence of Roberts's mental illness; and, finally, because of his failure to make adequate use of his court-appointed psychiatrist. Roberts complains that even though Pickell "had reason to suspect that Roberts was suffering from serious mental health problems" he failed to request Roberts's previous mental health records, to conduct any in-depth investigation into Roberts's social and psychological background, and to request anything but a cursory mental health evaluation of Roberts.

Roberts first argues that Pickell failed to hire an investigator or contact and interview witnesses for trial including Roberts's family members about testifying at the punishment phases of the trial concerning his rough childhood, battles with depression, and possible brain damage. *See Wiggins v. Smith*, 123 S.Ct 2527, 2535-37, 156 L.Ed.2d 471 (2003) (holding that "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence

-8-

. . . [including evidence of] family and social history.") (internal quotations and emphasis omitted); *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

We have held that when a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel. *See Autry v. McKaskle*, 727 F.2d 358, 361 (5th Cir. 1984) ("By no measure can [defendant] block his attorney's efforts and later claim the resulting performance was constitutionally deficient."); *Felde v. Blackburn*, 795 F.2d 400, 401-02 (5th Cir. 1990). However, if the defendant was not competent to make those instructions then he may pursue his *Strickland* claim. *See Autry*, 727 F.3d at 362.

Largely based on the affidavit submitted by Pickell, the state habeas court determined that Roberts was competent to instruct his counsel on trial strategy. Subsequent to the state habeas hearing, Roberts discovered that Pickell's affidavit was a virtual carbon copy of an affidavit that the attorney had submitted in a different case. In the federal district court, Roberts submitted the affidavit from the other case as new evidence challenging the presumption that the state habeas court's factual conclusion that Roberts was competent to direct his trial strategy was correct. The district court did not review the evidence, deferring to the state habeas court's factual determination that Roberts was competent.

"[A] determination of a factual issue made by a State court shall be presumed correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "If the applicant has failed to develop the factual basis of a claim

in State court proceedings, the court shall not hold an evidentiary hearing on the claim . . . ." 28 U.S.C. § 2254(e)(2). This is unless the claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence," 28 U.S.C. § 2254(e)(2)(A)(ii), and the claim provides sufficient grounds for habeas relief, *see* 28 U.S.C. § 2254(e)(2)(B). No court has considered whether due diligence requires that a party investigate the existence of affidavits from unrelated cases to determine whether ones submitted in its case are carbon-copies of those in others. However, engaging in the time and labor intensive task of investigating the records of *unrelated cases* for evidence that, in almost all instances, will bear no relevant, much less useful, evidence is beyond the requirements of due diligence. Therefore, the district court should have considered this new evidence in determining whether to accept the state habeas court's factual determinations.

A side-by-side comparison of the two affidavits demonstrates that Pickell used boiler-plate language both in his description of Roberts and in explaining his determination that Roberts was competent to direct trial strategy. However, this use of boiler-plate language, by itself, does not put into question the veracity of either Pickell's observations or his conclusions; nor does it put into question the state habeas court's factual determinations. Although Pickell used much of the same language to describe Roberts as he did the defendant in the other case, if those descriptions were accurate, the recycling of the language is not problematic. The relevant concern is whether Pickell accurately described his impressions of Roberts and whether his conclusions as to Roberts's competence were based in fact and were genuine. Roberts presents no evidence challenging either the veracity or the ultimate accuracy of Pickell's descriptions or conclusions. He only challenges Pickell's choice of language. This is not enough to rebut the presumption of correctness of the state habeas court's determination as to Roberts's competence as there is no new evidence suggesting its

-10-

determination is inaccurate. As the state habeas court found that Roberts was competent to direct trial strategy, Roberts cannot sustain a *Strickland* claim as he instructed his attorney to do the very thing he now claims demonstrates counsel was ineffective. Thus Roberts's claim that Pickell was ineffective for failing to hire an investigator and contact and interview witnesses for trial including Roberts's family members about testifying at the punishment phase of Roberts's trial fails as a matter of law, and jurists of reason would not find this determination debatable.

Roberts also argues that Pickell was deficient for failing to properly develop evidence of Roberts's mental illness. Pickell's affidavit, provided to the state habeas court, indicates that, prior to trial, he was aware of Roberts's "previous hospitalization for psychiatric problems" following a "suicide attempt." Yet, even though he was aware that Roberts had previously been admitted for treatment at a psychiatric institution, he did not request or obtain the record of that hospitalization. Where, as here, counsel is aware of the client's history of mental problems, the reasonableness of a decision made by counsel not to investigate that history is suspect. *See Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum . . . It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems."). Thus, it is at least debatable that Pickell violated his duty to make a reasonable investigation by failing to obtain) ) and investigate the content of) ) the record of Roberts's treatment for "suicide ideation." *See id*; *see also Brown v. Sternes*, 304 F.3d 677, 694 (7th Cir. 2002) ("Where a defense attorney has received information from a reliable source that his client has had a history of psychiatric problems, but failed to adequately investigate the history, counsel failed to provide effective assistance.").

-11-

As a part of his claim that Pickell was deficient for failing to properly develop evidence of Roberts's mental illness, Roberts argues that Pickell was deficient for failing to obtain a full neurophysical examination (including an EEG) of Roberts. The district court decided that this aspect of Roberts's ineffective assistance claim was procedurally barred because it was not "fairly presented" to the state courts such that it was not exhausted and could not be considered in federal court. *See* 28 U.S.C. § 2254(b)(1)(A). Roberts contends that the district court erred in applying the procedural bar because Roberts presented substantial evidence that, in failing to grant the full amounts requested in his motions for investigative assistance, the Texas Court of Criminal Appeals deprived his state habeas attorney of the funding needed to develop and present these claims.[5] *See* 28 U.S.C. § 2254(b)(1)(B)(ii) (providing an exception to the exhaustion requirement when "circumstances exists that render such [state] process ineffective to protect the rights of the applicant."). This argument fails as there is no right to counsel in habeas proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752, 111 S.Ct 2546 (1991) ("[t]here is no constitutional right to an attorney in state post-conviction proceedings . . . [c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."); *Martinez v. Johnson*, 255 F.3d 229, 240-41 (5th Cir. 2001). By implication, there is no right to funding of state habeas counsel. The claims were not exhausted and were properly dismissed.

---

[5] Roberts argues that, even though he specifically requested funds to develop the basis of the claim, that request was denied on the basis of an "arbitrary cap on fees and expenses," effectively ending the factual development of his case. Roberts's state habeas attorney filed two motions for investigative assistance, neither of which were granted in full. In support of his first motion for appointment of an investigator state habeas counsel detailed the different subjects that require investigation, including investigation into Roberts's medical history and history of a head injury. State habeas counsel's affidavit confirms that he was informed by the court over the telephone that he had met the statutory cap for expenses and that no additional money would be available. In that affidavit, state habeas counsel states that he considered a "thorough psychiatric and neurophysical evaluation . . . essential to a fair presentation of Mr. Roberts's claims," but that requesting more funds for an evaluation would have been an exercise in futility.

Roberts also contends that jurists of reason could debate whether Pickell's failure to make adequate use of his court-appointed psychiatrist constituted deficient performance. Jurists of reason could debate whether Pickell's failure to furnish Dr. Arambula with the record of Roberts's treatment at a psychiatric hospital or failure to inform Dr. Arambula of Pickell's childhood head injury constituted deficient performance. *See Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997) (holding trial counsel ineffective for failing to present expert with readily available mitigating evidence); *Clabourne v. Lewis*, 64 F.3d 1373 (9th Cir. 1995) (holding trial counsel ineffective for failing to adequately prepare testifying trial expert with recent mental health records which would have changed the defense expert's diagnosis, as well as state expert's diagnoses).

B

A "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694.

In the district court, Roberts presented evidence of his mental health records and affidavits from family members documenting his mental difficulties. This evidence was first introduced in federal habeas proceedings, and we may not consider this evidence as it was not properly presented to the state habeas court. *See* 28 U.S.C. § 2254(e)(2). We may consider it if it evidences a "factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(ii). Seeking and presenting medical records and affidavits from family members available at the time of the state habeas hearing is within the exercise of due diligence. *Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000). This new evidence may not be considered by this Court.

However, Roberts did present evidence to the state habeas court that he suffered a head injury as a child, and Pickell's affidavit concedes that he knew of Roberts's attempted suicide and bouts with depression. The Supreme Court has emphasized that defendant's troubled history is relevant to declaring his moral culpability, and that a defendant's "life history is a part of the process of inflicting the penalty of death." *Wiggins*, 123 S.Ct at 2543 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869 (1982)); *see Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."). Considering Pickell presented no evidence of Roberts's life history, and there is evidence that he suffered from head injuries and mental disease, the reliability of the jury's determination as to Roberts's culpability is, at best, questionable, and thus a reasonable jurist could debate whether Roberts has demonstrated prejudice.

III

For the foregoing reasons, we GRANT Roberts a COA on his claims that Pickell rendered ineffective assistance of counsel by failing to properly develop evidence of Roberts's mental illness,[6] and by failing to make adequate use of his court-appointed psychiatrist.

---

[6] We do not issue a COA as to counsel's failure to seek a full neurophysical examination (including an EEG) of Roberts, as this claim is procedurally barred. Nor do we issue a COA as to counsel's failure to interview Roberts's family members about testifying at the punishment phase of Roberts's trial.

-14-