United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 16, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 02-51339

_____

DOUGLAS ALAN ROBERTS,

Petitioner - Appellant,

versus

DOUG DRETKE, DIRECTOR TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee.

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, WIENER, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Douglas Alan Roberts appeals the district court's denial of his petition for habeas relief. He challenges both his Texas state capital murder conviction and his sentence. The district court denied relief on all grounds in Roberts's petition, but granted a COA as to the questions 1) whether the trial court acted reasonably in not *sua sponte* holding a competency hearing, and 2) whether the federal district court erred in not granting an evidentiary hearing, discovery, and expert assistance in connection with the federal habeas proceedings. We expanded the scope of the COA to include the questions whether Roberts's trial attorney rendered ineffective assistance of counsel by 1) failing to

properly develop evidence confirming or refuting that Roberts was mentally ill, and 2) failing to make adequate use of his court-appointed psychiatrist.

We find that the district court correctly concluded that the state habeas court's denial of Roberts's habeas claims was not unreasonable. We further find that the district court did not abuse its discretion by refusing to hold an evidentiary hearing. We thus AFFIRM the district court's ruling.

I

While high on crack-cocaine Roberts killed Jerry Lewis Vasquez. Within a few hours of the killing, after he sobered up, Roberts alerted local police of his crime and confessed to the killing. Roberts was then charged with the murder of Vasquez. Texas appointed Roberts counsel to represent him in his capital trial. Roberts immediately instructed his trial counsel, Steven Pickell, to steer the trial towards the imposition of the death penalty. To no avail, Pickell tried to discourage Roberts from this course. However, consistent with Roberts's instructions, Pickell waived voir dire, chose jury members who favored the death penalty, did not interview family members before trial, called no witnesses during the guilt/innocence phase of the trial, called no witnesses during the punishment phase, did not request a jury instruction on parole laws, and made no argument in favor of a life sentence. Pickell spent a total of fifty hours preparing for Roberts's trial. Consequently, neither the conviction nor the punishment were contested in any meaningful way.

Apparently concerned that Roberts may not have been right of mind, Pickell requested, and Texas granted, funding for a psychiatrist, Dr. Michael Arambula, M.D., to analyze Roberts's mental state. A short time prior to trial, Dr. Arambula interviewed Roberts for two hours. Based on that interview, police reports about Roberts, and the victim's autopsy report Dr. Arambula produced a psychiatric evaluation. In making this evaluation, Dr. Arambula did not review any of Roberts's

2

medical records, including records relating to Roberts's psychiatric hospitalization that occurred after a recent "suicide ideation." Pickell did not collect these records and Dr. Arambula did not request them. Picklell also did not inform Dr. Arambula about a head injury that Roberts suffered as a child. Neither Pickell nor Dr. Arambula spoke to any of Roberts's family members or former treating physicians about his medical and psychiatric history.

Dr. Arambula's report notes that Roberts admitted that he had previously "wanted to commit suicide," but that when asked "Mr. Roberts's denied any past psychiatric history, other than his addiction to crack cocaine," and denied that he currently had suicidal thoughts. It also noted that Roberts showed no signs of "anxiety, hallucinations, or delusions" and that "he denied that he felt sad." And finally it noted that Roberts's explained that he "didn't want to be locked up the rest of his life" and that Roberts blamed his "crack cocaine addiction" for his "taking the life of an innocent bystander."

Based on these observations, Dr. Arambula's stated in his report that "I cannot conclude that Mr. Roberts suffers from any significant degree of depression . . . or for that matter any other psychiatric disturbance." He further stated that "[t]he most salient issue in Douglas Roberts's history is his addiction to crack cocaine." And after first acknowledging that "Depression can sometimes affect a person's judgment and decision-making so severely that [he] wish[es] for premature death," he concluded that "I cannot find that depression exists to such a degree that its presence would coerce Mr. Roberts into seeking the death penalty."

Based on this report and his own observations, Pickell concluded that Roberts was competent to stand trial and to make decisions regarding trial strategy, including decisions explicitly designed to ensure the imposition of the death penalty. He also concluded that it was unnecessary to request

3

a competency hearing. The trial judge never saw Dr. Arambula's report, but based on his own observations of Roberts he decided that there was no reason to hold a competency hearing. Roberts was subsequently convicted and sentenced to death.

In both his direct appeal and state habeas application Roberts challenged his conviction and sentence. Among other claims, Roberts brought a *Pate* claim arguing that the trial judge should have ordered a competency hearing, and several *Strickland* claims arguing that Pickell provided ineffective assistance of counsel by not investigating Roberts's medical history and by adhering to Roberts's decisions regarding trial strategy. The state courts denied relief, concluding that both the trial judge and Pickell reasonably relied on their own observations of Roberts, and in the case of Pickell on Dr. Arambula's report, in deciding that a competency hearing was unnecessary and that Roberts was competent to direct his trial strategy towards a death sentence.

The state habeas court did, however, find that Dr. Arambula's medical conclusions about Roberts's mental health were based on an incomplete understanding of Roberts's medical and psychiatric history. It found that Pickell "did not make available to Dr. Arambula the previous medical records of the defendant as part of Dr. Arambula's examination and analysis, nor did he advise Dr. Arambula of a previous head injury suffered by the defendant." Those medical records were compiled a year before the murder while Roberts was in a psychiatric facility after threatening suicide. It is also clear from the record, and specifically Dr. Arambula's report, that the doctor did not speak to any of Roberts's family members or former physicians regarding Roberts's medical, psychiatric, or social history.

During the state habeas proceedings, counsel was once again appointed for Roberts. His counsel, David Sergi, made multiple requests for funding to investigate Roberts's case. His first

4

request was funded, and his second request was partially funded, and partially denied. After his initial investigation into Roberts's file and medical history, and after his second funding request, Sergi determined that he needed both expert testimony regarding Robert's mental health and a full mental health examination of Roberts to adequately present Roberts's habeas claims. Sergi made an oral inquiry to the Texas Court of Criminal Appeals regarding the possibility of the necessary further funding. Sergi was informed that he had met the funding cap set for Roberts's case and no further funding would be forthcoming. He then decided to make no further requests for assistance.

On Roberts's behalf, Sergi made a request to the state habeas trial judge to hold an evidentiary hearing. At such a hearing, he claims he would have challenged Pickell's conclusions concerning Roberts's mental health and his decisions regarding trial strategy. Further, he would have challenged Dr. Arambula's diagnosis of Robert's mental health at the time of trial. The state habeas court refused to hold a hearing and adopted in full Texas's recitation of the facts. Based on those facts, it then denied habeas relief on all claims.

Roberts then brought the present federal habeas petition. Counsel was again appointed for Roberts. His new counsel requested funding for a mental health examination and requested an evidentiary hearing and a period of discovery. All of these requests were denied by the district court. The district court concluded that Roberts had not diligently developed the factual record in state court and was thus not entitled to discovery, funding for a mental health examination or an evidentiary hearing. It concluded that Roberts's state habeas counsel's oral request for funding for a mental health examination and his request for an evidentiary hearing did not constitute due diligence in developing the factual record. The district court did, however, grant Roberts a COA on his request for an evidentiary hearing.

5

On the substance of Roberts claims, the district court held that the state habeas court erred in denying Roberts's *Pate* claim, and concluded that the trial court should have ordered a competency hearing. It, however, further concluded that although the state habeas court's ruling was incorrect, it was not unreasonable. As to Roberts's ineffective assistance of counsel claims, it held that Roberts could not establish prejudice during the guilt/innocence phase of the trial because the evidence of his guilt was overwhelming. It further held that as to the punishment phase of Roberts's trial, Pickell's performance was not deficient because Pickell simply followed Roberts's orders regarding trial strategy. It granted an additional COA on the *Pate* claim.

Roberts requested that this Court expand the COA to include his ineffective assistance of counsel claims. We granted that request in part, granting a COA as to whether Pickell rendered ineffective assistance of counsel by failing to properly develop evidence of Roberts's mental illness, or by failing to make adequate use of Roberts's court-appointed psychiatrist. *See Roberts v. Dretke*, 356 F.3d 632, 641 (5th Cir. 2004).

Roberts now brings this appeal.

II

This district court's findings of fact are reviewed for clear error, and its legal conclusions are reviewed *de novo*. *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001). A federal habeas petition filed by a person in state custody shall not be granted unless the state habeas proceedings 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Id.* (citing 28 U.S.C. § 2254(d)). Therefore, a federal court may not grant a writ

6

of habeas corpus based solely on a finding of error by a state court. *Id.* A writ may be granted only if a state court "arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Id.* The district court's discretionary decision to not grant an evidentiary hearing is reviewed for abuse of discretion. *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998). However, its ruling that it was legally forbidden to hold an evidentiary hearing is reviewed *de novo*. *See Clark v. Johnson*, 202 F.3d 760, 765-66 (5th Cir. 2000).

Roberts first argues that his due process rights were violated by the trial court's failure to hold a competency hearing to determine whether he was competent to stand trial and direct his trial strategy. Under *Pate v. Robinson*, 383 U.S. 375 (1966), a trial court must hold a competency hearing when there is evidence before the court that objectively creates a bona fide question as to whether the defendant is competent to stand trial. *Id.* at 385; *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980). The petitioner need not establish that he was incompetent to stand trial to obtain relief, rather he need only establish that the trial judge should have ordered a hearing to determine his competency. *See Lokos*, 625 F.2d at 1261. "The question is: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about [the] defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Id.*; *see Medina v. California*, 505 U.S. 437, 448 (1992) (The key is whether the defendant had "the capacity to participate in his defense and understand the proceedings against him.").

In *Pate*, "[f]our witnesses expressed the opinion that Robinson was insane." *Pate*, 383 U.S. at 383. There was also evidence in the record establishing that Robinson had previously been

hospitalized in a state mental institution where he was observed to have "symptoms of mental illness." *Id.* at 379-80. Further, the core of Robinson's defense was that he was insane. *Id.* at 384. In this case, there was no evidence before the trial court suggesting that Roberts was insane or that he was unable to participate in his defense or understand the proceedings against him. Roberts argues that his irrational behavior regarding trial strategy should have suggested to the trial judge that his competency was in question. In fact, those very instructions suggest that Roberts was quite capable of conversing with his trial counsel regarding trial strategy, and was not only able to participate in his defense but was also able to direct it. Further, there was no medical evidence or testimony presented at trial suggesting that Roberts was unable to communicate with his trial attorney or understand the proceedings against him. The state habeas court's conclusion that Roberts was not entitled to relief under *Pate v. Robinson* is neither unreasonable nor contrary to Supreme Court precedent.

Additionally, we decline to adopt a *per se* rule that, as a matter of law, a trial court must doubt a capital punishment defendant's competency, or conclude that such defendant does not understand the proceedings against him or appreciate their significance, or conclude that he cannot rationally aid his attorney in his defense simply because it is obvious to the court that the defendant is causing his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty.

Roberts next argues that his trial counsel Steven Pickell provided ineffective assistance by not investigating Robert's medical and social history and by not presenting that evidence to the jury in either the guilt/innocence or punishment phases of his trial. Further, he argues that Pickell misused the court appointed psychiatrist by not providing Dr. Arambula with Roberts's medical records and social history and by not putting Dr. Arambula on the stand to testify as to Roberts's mental health

8

history based on an accurate psychiatric evaluation.

To establish a claim of ineffective assistance of counsel a petitioner must establish that his trial counsel provided deficient performance, such that it was below an "objective standard of reasonableness," and that he was prejudiced by that deficient performance, such that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "[A] particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Id.* Trial counsel provides deficient performance if he fails to investigate a defendant's medical history when he has reason to believe that the defendant suffers from mental health problems. *See Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental health problems."); *Profitt v. Waldron*, 831 F.2d 1245, 1248-49 (5th Cir. 1987) (holding that counsel has duty to investigate mental health history of defendant who has been committed to a mental institution); *Beavers v. Balkcom*, 436 F.2d 114, 116 (5th Cir. 1981) (holding that counsel has duty to obtain medical records and speak with treating physicians). Further, seeking the aid of a court-appointed psychiatrist, in some circumstances, does not excuse the absence of further investigation. *See Profitt*, 831 F.2d at 1249 (finding that relying on opinion of court-appointed psychiatrist was not sufficient when counsel knew that defendant had escaped from a mental institution).

Roberts argues that Pickell failed to properly investigate Roberts's medical history because

9

Pickell did not contact Roberts's treating physicians or collect Roberts's medical records regarding an episode of "suicide ideation" that Roberts's experienced a year before he killed Vasquez. Further, Roberts argues, that Pickell did not contact Roberts's family members regarding either the suicide ideation episode or a head injury Roberts suffered as a child. Texas argues that Pickell fulfilled his duty to investigate by having Dr. Arambula interview Roberts and produce a psychiatric evaluation. It further argues that Pickell reasonably concluded that further investigation of Roberts's background was unnecessary after Dr. Arambula's report confirmed Pickell's belief that Roberts was not suffering from any mental illness and was able to direct trial strategy. Roberts counters that Pickell could not reasonably have relied on that report because Pickell did not inform Dr. Arambula of the suicidal ideation episode or provide him with Roberts's medical records.

There is no doubt that Pickell neither collected Roberts's medical records nor did he contact Roberts's treating physicians regarding Roberts's suicide ideation or his subsequent treatment for related depression; nor did Pickell inform Dr. Arambula about either that episode or Roberts's childhood head injury. However, it is clear from Dr. Arambula's report that the doctor was well aware of the fact that Roberts had previously had suicidal thoughts. Dr. Arambula specifically refers to Roberts having "reached a period when he wanted to commit suicide." Dr. Arambula discounted the significance of this episode finding that "it is difficult to find another psychiatric disturbance (other than cocaine addiction) in [Roberts's] history," and concluded that Roberts was not at that time suffering from any symptoms of depression.

Pickell reasonably relied on Dr. Arambula report to conclude that Roberts was competent to stand trial and direct his trial strategy. Considering the strong conclusions in Dr. Arambula's report about Roberts's mental health, and Dr. Arambula's decision not to request any further information

10

regarding Roberts's mental health history, Pickell reasonably concluded that further investigation of Robert's mental health history was unnecessary. This is particularly the case here because)) like the trial judge who observed Roberts throughout the proceedings)) Pickell did not believe that Roberts was suffering from any mental illness or that Roberts was unable to direct his defense. The state habeas court thus reasonably concluded that Pickell did not provide deficient performance by failing to further investigate Roberts's medical history, and its decision is not contrary to Supreme Court precedent. It also reasonably concluded that Roberts cannot claim deficient performance regarding trial strategy, including the use of the court-appointed psychiatrist, because Pickell simply acquiesced to Roberts's self-destructive instructions regarding trial strategy after first challenging those decisions and determining that Roberts was competent to direct his defense. *See Autry v. McKaskle*, 727 F.2d 358, 361 (5th Cir. 1984) ("By no measure can [the defendant] block his attorney's efforts and later claim the resulting performance was constitutionally deficient.").

Roberts has also failed to establish prejudice. The record is devoid of any medical evidence that would put Dr. Arambula's conclusions as to either Roberts's mental health or his competence to direct trial strategy into doubt. In the state habeas court, Roberts failed to submit medical records from his episode of suicide ideation or affidavits from the treating physicians. He further failed to submit medical records regarding his childhood head injury, or affidavits from Roberts's family members documenting a history of mental illness. Additionally, there is no evidence in the record suggesting that Dr. Arambula would change the psychiatric diagnosis in his report based on a review of Roberts's medical records.

In the federal district court, Roberts did submit into evidence affidavits from family members

11

documenting his mental health history and medical records from his treatment for suicide ideation.[1] The district court refused to consider this evidence or conduct an evidentiary hearing finding that Roberts failed to develop the factual basis of his claims in the state habeas court. *See* 28 U.S.C. § 2254(e)(2) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim . . . ."). Roberts argues that he was prevented from developing the factual record because Texas refused to provide adequate funding for his investigation and because the state habeas court refused to hold an evidentiary hearing.

We have held that in cases where a petitioner was denied an evidentiary hearing by the state habeas court and was denied funding by the state due to a cap on spending "failure to fully develop the record below is not attributable to any fault of" the petitioner. *Clark*, 202 F.3d at 765 (holding § 2254(e)(2) not applicable when petitioner's request for investigation funds and evidentiary hearing were denied); *see also Beazley v. Johnson* 242 F.3d 248, 273 (5th Cir. 2001) ("We do not suggest the state has an obligation to pay for investigation of as yet undeveloped claims; but if the prisoner has made a reasonable effort to discover the claims . . . § 2254(e)(2) will not bar him from developing them in federal court.").

However, "[m]ere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his claim." *Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000). We have already held that Roberts was not diligent in seeking his medical records and affidavits from family members. *See Roberts*, 356 F.3d at 641. And while further funding from the state might have provided Roberts the opportunity to seek expert assistance, it is not clear that,

---

[1] Roberts did not produce an affidavit from Dr. Arambula or any medical evidence relating to his childhood head injury.

12

without access to the medical records that Roberts failed to gather, such an expert would have produced any useful testimony. Regardless, no action by the state habeas court prevented Roberts from seeking an affidavit from Dr. Arambula concerning whether a more complete understanding of Roberts's medical history would have led to a change in his medical opinion about Roberts's mental health and competence. While the state habeas court could have been more helpful with regards to funding and holding an evidentiary hearing, Roberts was not diligent in developing the factual record to support his claim with the resources at his disposal. The district court did not err by refusing to hold an evidentiary hearing.

## III

The district court correctly concluded that the state habeas court's denial of Roberts's *Pate* and *Strickland* claims was not unreasonable or contrary to Supreme Court precedent. Further, the district court did not err by concluding that it was legally forbidden from holding an evidentiary hearing. The district court's ruling is AFFIRMED.